RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0120p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

ALEXANDER ROSS,

*Plaintiff-Appellant,*

*v.*

No. 25-1802

ROBINSON, HOOVER & FUDGE, PLLC,

*Defendant-Appellee.*

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:24-cv-11717—Denise Page Hood, District Judge.

Decided and Filed: April 22, 2026

Before: SILER, MOORE, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:** John A. Evanchek, Curtis C. Warner, KELLEY & EVANCHEK, Canton, Michigan, for Appellant. Eugene Xerxes Martin, IV, MARTIN GOLDEN LYONS WATTS MORGAN PLLC, Dallas, Texas, for Appellee.

───────────────

## OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge. Alexander Ross and his then-wife bought a used car in Oklahoma. After he and his wife divorced, Ross moved to Michigan. Following his move, the former couple failed to make their car payments and their creditor hired Robinson, Hoover & Fudge, PLLC ("RHF"), an Oklahoma-based law firm, to bring a breach-of-contract action against Ross and his ex-wife in Oklahoma. Ross eventually defaulted. By that time, RHF had learned that Ross was living and working in Michigan. RHF then used the Oklahoma

default judgment to submit a garnishment summons to the Oklahoma registered agent of Ross's employer's parent company.  The parent company passed the garnishment summons to Ross's employer, which began garnishing wages Ross earned in Michigan.

Ross then filed this action in the U.S. District Court for the Eastern District of Michigan, bringing claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Michigan Regulation of Collection Practices Act ("MRCPA"), Mich. Comp. Laws § 445.251 *et seq.*  The district court dismissed the complaint after finding that RHF had not purposefully established minimum contacts with Michigan.  Because RHF purposefully directed its actions at Ross, intentionally targeting him in Michigan and causing him to suffer his injury in the forum state, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

In February 2018, Ross and his then-wife lived outside of Tulsa, Oklahoma and jointly purchased a used 2014 Toyota Scion Xb from a Tulsa-based auto dealership.  R. 1 (Compl. ¶¶ 9–13)[1]; R. 7-3 (Purchase Agreement at 1–6) (Page ID #91–96).  Following the sale, the dealership assigned its rights under the purchase agreement to Auto Advantage Finance LLC ("AAF").  R. 1 (Compl. ¶ 10).  Within a year of their purchase, Ross and his wife divorced, and Ross moved to Michigan in July 2019.  R. 1 (Compl. ¶¶ 11–12); R. 10-2 (Ross Aff. ¶ 3) (Page ID #198).  He obtained a Michigan driver's license and notified the U.S. Postal Service of his new address, 30815 Cooley Boulevard in Westland, Michigan.  R. 1 (Compl. ¶¶ 13–14); R. 10-2 (Ross Aff. ¶¶ 4–7) (Page ID #199).

The car, however, remained in Oklahoma with Ross's ex-wife.  R. 1 (Compl. ¶ 17).  But the former couple failed to stay up to date on their payments, so AAF repossessed and sold the car in February 2020.  *Id.* ¶¶ 15–17; R. 1-2 (Notice of Sale) (Page ID #28).  On March 13, 2020, AAF mailed Ross a notice, informing him of the repossession and sale and alerting him that he remained liable for approximately $8,500 pursuant to the purchase agreement.  R. 1-2 (Notice of

---

[1]Ross's complaint, *see generally* R. 1 (Compl. ¶¶ 1–106), and his opposition to RHF's motion to dismiss, *see generally* R. 10 (Pl.'s Opp'n to Mot. to Dismiss at 1–26), lack CM/ECF-generated PageID numbers, so all citations to these documents reference internal pagination.

Sale) (Page ID #28).  AAF mailed this notice to Ross at 30819—not 30815—Cooley Boulevard. *Id.*

Six months later, in September 2020, AAF retained the services of RHF and commenced a breach-of-contract action against Ross and his ex-wife in Oklahoma state court.  R. 1 (Compl. ¶ 20); R. 1-3 (Petition) (Page ID #30–31).  At the time RHF filed the Oklahoma action, RHF admits that, as far as it was aware, Ross's last known address was 30819 Cooley Boulevard.  R. 7-2 (Fudge Aff. ¶ 3(d)) (Page ID #86).  Even so, RHF first attempted to serve Ross at an Oklahoma address in November 2020.  R. 1 (Compl. ¶ 25); R. 1-4 (Return of Non-Service) (Page ID #33).  Unsurprisingly, the process server did not find Ross, and the person living there said that Ross had moved "somewhere up north."  R. 1-4 (Return of Non-Service) (Page ID #33) (citation modified).  One month later, RHF simultaneously requested that the Oklahoma state court serve Ross by publishing notice of the action in an Oklahoma newspaper and affirmed that it had failed to identify any other address at which it could personally serve Ross.  R. 1-6 (Aff. of Due Diligence ¶¶ 1–5) (Page ID #37); R. 7-7 (Notice by Publication) (Page ID #116).  The notice was subsequently published in the *Tulsa World*.  R. 7-7 (Aff. of Publication) (Page ID #118).  In April 2022, RHF filed a motion for default judgment, R. 1-8 (Motion for Default Judgment) (Page ID #41), which the Oklahoma state court entered in December 2022, R. 7-7 (Entry of Default Judgment) (Page ID #120).  Just over two weeks later, RHF attempted to mail notice of the entry of default judgment to Ross at 30819 Cooley Boulevard.  R. 1-9 (12/22/2022 Certificate of Service) (Page ID #43).

After obtaining a default judgment, RHF submitted garnishment summonses to entities it believed employed Ross.  RHF first submitted a summons to Penske Logistic LLC ("Penske") in March 2023.[2]  R. 7-7 (2023 Penske Garnishment Answer at 1–2) (Page ID #122–23).  Penske informed RHF that Ross left the company in February 2023, but it also provided a new Michigan

---

[2]Ross alleges that RHF sent, and Penske answered, a garnishment summons in 2022.  R. 1 (Compl. ¶ 48); R. 1-10 (2022 Penske Garnishment Answer at 1–3) (Page ID #45–47).  The answer he cites in the complaint and attaches as an exhibit, however, was filed in a different Oklahoma trial court in a case with a different caption and case number than the action AAF filed against him.  *Compare* R. 1 (Compl. ¶ 20) (explaining that AAF filed case number CS-2020-5574 against him in Tulsa County) *with* R. 1-10 (2022 Penske Garnishment Answer at 1) (Page ID #45) (responding to a garnishment summons in case number CS21158 filed by Credit Acceptance Corporation in Mayes County).  Due to these discrepancies, we rely on the garnishment answer that RHF filed with its motion to dismiss, as it lists the correct parties, case number, and court.

No. 25-1802               *Ross v. Robinson, Hoover & Fudge, PLLC*               Page 4

address for Ross:  2500 Holmes in Ypsilanti, Michigan.  *Id.*  The following year, in February 2024, RHF sent a garnishment summons to a different entity, Daimler Truck North America LLC ("Daimler Truck").  *See* R. 1 (Compl. ¶ 55); R. 7-7 (Daimler Wage Garnishment Aff.) (Page ID #124).  Ross alleges that RHF "purposefully" sent the garnishment summons to Daimler Truck, not his actual employer, Detroit Diesel Corporation ("Detroit Diesel").  R. 1 (Compl. ¶¶ 53, 55).  Although he admits that Daimler Truck is headquartered in Oregon, he asserts that Detroit Diesel, as its name suggests, is located in Detroit.  R. 10-2 (Ross Aff. ¶¶ 10–11) (Page ID #199–200).  In support, he points to a copy of his paystub, which lists Detroit Diesel as located at "13400 Outer Drive West Detroit, MI."  R. 10-2 (Ross's Paystub) (Page ID #202).

In February 2024, Detroit Diesel answered the garnishment summons sent to Daimler Truck.[3]  *See* R. 1-11 (Detroit Diesel Garnishment Answer at 1–3) (Page ID #49–51).  It confirmed that Ross was an employee, listed Ross's address as 16677 Inkster Road in Taylor, Michigan, and computed the appropriate garnishment amount.  R. 1-11 (Detroit Diesel Garnishment Answer at 1–3) (Page ID #49–51).  Detroit Diesel had its answer notarized by a notary public in Oregon.  *Id.* at 2 (Page ID #50).  As of June 2024, over $2,500 has been garnished from wages Ross has earned working for Detroit Diesel, and the garnishments "are continuing."  R. 1 (Compl. ¶¶ 58–59); R. 10-2 (Ross's Paystub) (Page ID #202).

In July 2024, shortly after Detroit Diesel began garnishing wages from his paycheck, Ross brought this putative class action against RHF in the Eastern District of Michigan.  *See generally* R. 1 (Compl. ¶¶ 1–106).  In the complaint, Ross claims that RHF violated the FDCPA and the MRCPA by garnishing his wages without domesticating the Oklahoma default judgment, as he asserts Michigan's Uniform Enforcement of Foreign Judgments Act ("MUEFJA") requires.  *Id.* ¶¶ 61–79, 92–103.  RHF then filed a pre-answer motion to dismiss the complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  R. 7 (Def.'s Mot. to Dismiss at 1–22) (Page ID #63–84).  Ross opposed, R. 10 (Pl.'s Opp'n to Mot. to Dismiss at 1–26), RHF replied, R. 12 (Def.'s Reply at 1–7) (Page ID #209–15), and neither party requested

[3]Detroit Diesel appears to be a subsidiary of Daimler Truck.  *See* R. 7-9 (Detroit Diesel Website) (Page ID #152).

jurisdictional discovery or an evidentiary hearing.  After hearing oral argument, R. 17 (Oral Arg. Tr. at 1–21) (Page ID #231–51), the district court granted the motion, finding that RHF had insufficient contacts with Michigan to support personal jurisdiction.  *Ross v. Robinson, Hoover & Fudge, PLLC*, No. 24-11717, 2025 WL 2265439, at *3–4 (E.D. Mich. Aug. 7, 2025) (order). Ross now appeals.

## II.  ANALYSIS

### A.  Standard of Review

We review de novo a district court's decision to dismiss a complaint for lack of personal jurisdiction.  *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 660 (6th Cir. 2023).  The plaintiff bears the burden of establishing that the forum has personal jurisdiction over the defendant.  *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012).  The nature of the "plaintiff's burden, however, depends on whether the [district] court chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue."  *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989).  "Where, as here, the district court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) motion, rather than conducting an evidentiary hearing or limited discovery, the plaintiff's burden is 'relatively slight.'"  *Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988)).  Under these circumstances, the plaintiff need only make "a *prima facie* showing that personal jurisdiction exists" to defeat the motion to dismiss.  *Serras*, 875 F.2d at 1214.  The plaintiff can do so "through the complaint" alone, as well as through supplementary affidavits.  *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020).  We view "the facts in the light most favorable" to the plaintiff, meaning that we draw all reasonable inferences in their favor and do "not consider facts proffered by the defendant that conflict with those offered by the plaintiff."  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).  We have explained that "[a]ny other rule would empower a defendant to defeat personal jurisdiction merely by filing a written affidavit contradicting jurisdictional facts alleged by a plaintiff."  *Serras*, 875 F.2d at 1214.  Yet we may consider facts adduced by the defendant that "do not conflict with those offered by [the plaintiff]."  *Carbone v. Kaal*, 140 F.4th 805, 813 n.2 (6th Cir.

2025); *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012) ("[W]e may consider the defendant's undisputed factual assertions.").

## B.  Personal Jurisdiction

Ross brings claims under both federal and state law.  When, as here, the federal statute at issue does not provide for nationwide service of process, the district court's exercise of personal jurisdiction must be authorized by the forum state's long-arm statute and the Fourteenth Amendment's Due Process Clause.  *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016); *see* Fed. R. Civ. P. 4(k)(1)(A).  Michigan's long-arm statutes do not necessarily reach as far as the Due Process Clause permits, so "the determination of whether a court sitting in Michigan can exercise personal jurisdiction over a defendant requires two separate analyses." *Sullivan*, 79 F.4th at 666.  The order in which a court conducts these analyses, however, is a matter of discretion.  *See Conn*, 667 F.3d at 711–12 ("[I]f jurisdiction is not proper under the Due Process Clause it is unnecessary to analyze jurisdiction under the state long-arm statute, and vice-versa.").  Here, the district court discussed whether Michigan law authorized it to exercise personal jurisdiction over RHF but declined to decide the issue, granting RHF's motion to dismiss on constitutional grounds.  *Ross*, 2025 WL 2265439, at *3–4.  Our analysis, therefore, begins with the strictures of the Due Process Clause.

### 1.  Due Process

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts."  *Walden v. Fiore*, 571 U.S. 277, 283 (2014).  In personam jurisdiction over a nonresident defendant requires that the defendant have "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  A defendant's contacts with the forum state may give rise to one of two varieties of in personam jurisdiction.  The first type, general jurisdiction, permits a forum "to hear any and all claims against" a defendant if the defendant's "affiliations with the State are so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v.*

*Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317). The second type, specific jurisdiction, "focuses on 'the relationship among the defendant, the forum, and the litigation,'" *Walden*, 571 U.S. at 284 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)), "grant[ing] jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state," *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012).

Ross contends that RHF is subject to specific jurisdiction in Michigan, not general jurisdiction. D. 19 (Appellant Br. at 20–21). We therefore apply our "three-part analysis to determine whether jurisdiction accords with due process." *Schneider*, 669 F.3d at 701. An exercise of specific jurisdiction comports with due process if: (1) the defendant purposefully availed itself "of the privilege of acting in the forum state or causing a consequence in the forum state"; (2) the plaintiff's cause of action arises from or relates to the defendant's contacts with the forum state; and (3) "the exercise of jurisdiction over the defendant [is] reasonable." *Id.* (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

We begin at step one—purposeful availment of the privileges of conducting activities in Michigan. "The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* (quoting *Citizens Bank v. Parnes*, 376 F. App'x 496, 502 (6th Cir. 2010)). Ross and RHF agree that we should analogize RHF's alleged actions, which Ross claims amount to violations of the FDCPA and the MRCPA, to tortious conduct. D. 19 (Appellant Br. at 35–37); *see* D. 20 (Appellee Br. at 13–17). Tortious conduct equates to purposeful availment "when the defendant intentionally cultivates contacts with the forum State." *Johnson v. Griffin*, 85 F.4th 429, 433 (6th Cir. 2023); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) ("[A] forum legitimately may exercise personal jurisdiction over a nonresident who 'purposefully directs' his activities toward forum residents.").

Two Supreme Court cases set the framework for our analysis. The first is *Calder v. Jones*, 465 U.S. 783 (1984). There, a California resident brought libel claims against a Florida-based magazine editor and reporter. *Id.* at 784–86. The Court held that the defendants had

sufficient contacts with California to support personal jurisdiction in that state. *Id.* at 788–91. The story that they published "concerned the California activities of a California resident," relied on "California sources," circulated in California, and harmed the plaintiff's reputation among those in California's entertainment industry. *Id.* at 788–89. In short, because their "actions were expressly aimed at California" and "calculated to cause injury to [the plaintiff] in California," the defendants should have anticipated defending themselves in a California forum. *Id.* at 789–91.

The second case is *Walden*. In that case, the defendant police officer seized thousands of dollars in cash that the plaintiffs, professional gamblers, had in their possession while waiting at their gate in the Atlanta airport. 571 U.S. at 279–80. Following the seizure, the police officer drafted a probable-cause affidavit that allegedly misrepresented his interaction with the plaintiffs and forwarded it to the local U.S. Attorney's office. *Id.* at 280–81. Upon returning to their home state of Nevada, the plaintiffs sued the police officer and asserted that Nevada had personal jurisdiction over him because he had known that "his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." *Id.* at 279. The Court disagreed. The conduct at issue had occurred in Georgia—that was where the police officer had "approached, questioned, and searched [the plaintiffs]," "seized the cash at issue," and drafted the affidavit. *Id.* at 288. Although the police officer had supposedly known that the plaintiffs were Nevada residents, the plaintiffs' connections to the forum state could not "drive the jurisdictional analysis." *Id.* at 289. And although it was true that the plaintiffs felt their injury in Nevada, that was mere happenstance, as they would have experienced the injury "wherever else they might have traveled and found themselves wanting more money than they had." *Id.* at 290.

Our own caselaw has helped further demarcate the boundary between *Calder* and *Walden*. In *Johnson*, for example, a California-based comedian posted a series of messages on social media, accusing a business executive of engaging in "homophobic conduct" in Tennessee, identifying him as a Tennessee resident, and tagging his Nashville-based employer so that other users could reach out to the company. 85 F.4th at 431. The executive was fired after customers threatened to cut ties with his employer, causing him to bring tort claims against the comedian in Tennessee. *Id.* at 432. We held that Tennessee had personal jurisdiction over the California comedian because the case had "more parallels to *Calder* than to *Walden*." *Id.* at 433. The

comedian's posts on social media discussed actions the executive took in Tennessee and damaged the executive's Tennessee career and "livelihood." *Id.* at 433–34. The comedian, moreover, "'undoubtedly knew' that the 'focal point' of her [posts] concerned Tennessee." *Id.* at 433 (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007)).

RHF asserts that *Walden* controls this case, D. 20 (Appellee Br. at 16–17), and the district court agreed, *Ross*, 2025 WL 2265439, at *3. We disagree, as we believe that this case bears a closer resemblance to *Calder* and *Johnson* than to *Walden*. Viewing the facts in the light most favorable to Ross, and drawing all reasonable inferences in his favor, we conclude that he has made a prima facie showing that RHF "'purposefully directed' [its] activities at" Ross, a "resident[] of the forum," thereby purposefully availing itself of the privileges of conducting activities in Michigan. *Burger King Corp.*, 471 U.S. at 472 (quoting *Keeton*, 465 U.S. at 774). As early as 2020, RHF knew that Ross lived and worked in Michigan. AAF informed RHF that Ross's last-known address was in Michigan, R. 7-2 (Fudge Aff. ¶ 3(d)) (Page ID #86); *see* R. 1-2 (Notice of Sale) (Page ID #28), and the process server that RHF had hired to serve Ross in Oklahoma relayed that Ross had moved out of state, to "somewhere up north," R. 1-4 (Return of Non-Service) (Page ID #33) (citation modified). Once it secured a default judgment, RHF attempted to mail notice to Ross in Michigan. R. 1-9 (12/22/2022 Certificate of Service) (Page ID #43). When Penske answered RHF's garnishment summons, it provided RHF with yet further confirmation that Ross was living and working in Michigan. *See* R. 7-7 (2023 Penske Garnishment Answer at 1–2) (Page ID #122–23). Then, RHF submitted a garnishment summons that ultimately reached Detroit Diesel. *See* R. 1-11 (Detroit Diesel Garnishment Answer at 1–3) (Page ID #49–51). Detroit Diesel operates a factory in Michigan, where Ross still works. R. 10-2 (Ross Aff. ¶ 10) (Page ID #199); R. 10-2 (Ross's Paystub) (Page ID #202). From the wages he earns working there, Detroit Diesel has been remitting RHF a periodic cut. R. 1 (Compl. ¶ 59); R. 10-2 (Ross's Paystub) (Page ID #202).

Consequently, RHF's "intentional, and allegedly tortious, actions were expressly aimed at [Michigan]." *Calder*, 465 U.S. at 789. Unlike the *Walden* plaintiffs, Ross did not experience his injury in Michigan merely because he made a unilateral choice to travel there after he was the

victim of unlawful conduct outside the forum.  *See MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 901 (6th Cir. 2017) ("*Walden* simply holds that an *out-of-stat*e injury to a forum resident, *standing alone*, cannot constitute purposeful availment." (emphasis added)).  To the contrary, RHF has targeted the wages Ross earns working in Michigan, and allegedly has done so in a manner that impermissibly circumvents the MUEFJA.[4]  The garnishment summons that reached Detroit Diesel has prompted a Michigan employer to withhold continuously some of the wages earned by a Michigan employee for work he completed in a Michigan factory.  Not only has garnishing Ross's wages inflicted tangible financial harm on Ross in Michigan, but also it has imposed administrative burdens on his employer, who appears to pay his wages from Michigan.  *See Johnson*, 85 F.4th at 434 (concluding that the defendant comedian's social media posts "had real world consequences for Tennessee" because they affected the executive's "livelihood" and imposed costs on his Nashville-based employer); *see also Onderik v. Morgan*, 897 F.2d 204, 208 (6th Cir. 1989) (sharing information with an employer, leading it to fire two Michigan-based employees, subjected the defendants to personal jurisdiction in Michigan).

Granted, RHF apparently sent the garnishment summons to Daimler Truck in Oregon, not directly to Detroit Diesel in Michigan.  *See* R. 1 (Compl. ¶ 55); R. 7-7 (Daimler Wage Garnishment Aff.) (Page ID #124).  This, however, did not result in a "random, fortuitous, or attenuated" contact in Michigan.  *Walden*, 571 U.S. at 286 (quoting *Burger King Corp.*, 471 U.S. at 475).  Ross alleges that RHF intentionally avoided sending the garnishment summons to Detroit Diesel, submitting it instead to Daimler Truck, all while fully expecting that the summons would lead a Michigan employer to withhold from Ross a portion of the wages he earns in Michigan.  R. 1 (Compl. ¶¶ 53, 55).  Indeed, Ross's factual allegations and evidentiary submissions sufficiently demonstrate that RHF knew that Ross was living and working in Michigan.  The fact that RHF relied on intermediaries, who it expected would "almost certainly" do its bidding, "does not make [RHF's] actions any less purposefully directed at" Ross in Michigan.  *Schneider*, 669 F.3d at 702–03.  Drafting and sending the garnishment summons, RHF "was the key actor in directing the harm inflicted on" Ross.  *Id.* at 703.  In short, we can

---

[4]Given the procedural posture of this appeal, we have no occasion to pass on the veracity of Ross's assertion that the MUEFJA requires an out-of-state judgment creditor to domesticate their judgment before garnishing a Michigan employee's wages.

reasonably infer from the facts alleged and presented by Ross that RHF "expressly aimed" its allegedly unlawful conduct at Michigan, *Calder*, 465 U.S. at 789, and "undoubtedly knew" that its actions would have deleterious consequences in Michigan, *Johnson*, 85 F.4th at 433 (quoting *Air Prods. & Controls, Inc.*, 503 F.3d at 553); *see also SnapPower v. Lighting Def. Grp.*, 100 F.4th 1371, 1377 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1424 (2025) (contacting Amazon in Washington subjected the defendant patent holder to suit in Utah because it asked Amazon to delist the Utah plaintiff's products, "necessarily affect[ing] marketing, sales, and other activities within Utah"). Accordingly, at this juncture, Ross has sufficiently demonstrated that RHF has "'purposefully directed' [its] activities at [a] resident[] of the forum," purposefully availing itself of the privileges of conducting activities in Michigan and rendering it amenable to suit there. *Burger King Corp.*, 471 U.S. at 472.

This conclusion tracks the outcome in *Daniels v. Sommers*, 556 P.3d 1113 (Wash. Ct. App. 2024), one of the few decisions to address whether garnishing a forum-state employee's wages constitutes purposeful availment. The plaintiffs in that case, Daniels and Halverson, signed, and later breached, a retainer agreement with a California attorney while they lived in California. *Id.* at 1117–18. The attorney subsequently brought a breach-of-contract action against them, and Daniels and Halverson defaulted. *Id.* By that point, however, Daniels and Halverson had moved to Washington, where Halverson started working at a local Lowe's. *Id.* The default judgment was ultimately assigned to two California-based debt collectors, each of whom used the judgment to secure wage-garnishment orders from California state courts. *Id.* at 1118. The debt collectors served the orders on Lowe's in California, which caused Lowe's to garnish wages Halverson earned in Washington. *Id.* Thus, relying on *Calder*, the Washington Court of Appeals held that the debt collectors "had sufficient purposeful contacts with Washington to invoke personal jurisdiction" because they had intentionally garnished Halverson's wages with the knowledge that he "worked in Washington and that his wages would be garnished there." *Id.* at 1124. Indeed, given the strong parallels between this case and *Daniels*, we see little reason to reach the opposite result.

RHF offers up several counterarguments, but none of them persuade. RHF first contends that Ross's injury did not occur in Michigan because his wages "were intercepted before they

reached" the state.  D. 20 (Appellee Br. at 24–25).  In support of this argument, RHF points to corporate registration information that purportedly demonstrates that Detroit Diesel is incorporated in Delaware and maintains its corporate headquarters in Oregon, R. 7-6 (Corporate Registration Lookups) (Page ID #105–06), the fact that an Oregon notary notarized Detroit Diesel's garnishment answer, R. 1-11 (Detroit Diesel Garnishment Answer at 1–3) (Page ID #49–51), and that the funds paid to RHF were withdrawn from an Ohio-based bank (JP Morgan Chase Bank, NA) by a Texas-based garnishment servicer (ADP Garnishment Services), R. 7-8 (Disbursement Statements) (Page ID #128–34).  Looking to this information, the district court agreed with RHF and found that Ross's wages "did not even make it to Michigan before they were distributed to RHF." *Ross*, 2025 WL 2265439, at *3.

But RHF's argument and the district court's findings are flawed on multiple levels.  On one level, they overread RHF's submissions and discount Ross's countervailing submissions. The checks that RHF submitted to the district court do not indicate that they were drawn from an Ohio-based account—they simply state that JP Morgan Chase Bank, NA is based in Ohio.  *See* R. 7-8 (Disbursement Statements) (Page ID #128–34).  It is thus far from clear where the funds were drawn from, and quite impossible to conclude that the funds had been "intercepted" before they ever made it to Michigan.  Even assuming, however, that the funds passed through an Ohio-based account, that account did not belong to Detroit Diesel.  The checks bear ADP's logo and are signed by "An Authorized representative[] of ADP." *Id.*  Thus, it seems that Detroit Diesel transferred funds to ADP, which then passed them along to RHF.  And Ross's evidence suggests that Detroit Diesel did so from Michigan.  His paystub from Detroit Diesel lists the company as having an address in Michigan, supporting the reasonable inference that Detroit Diesel paid Ross from Michigan.  *See* R. 10-2 (Ross's Paystub) (Page ID #202).  Thus, to the extent that RHF's submissions contradict this conclusion, they are "irrelevant," and the district court ought to have ignored them.  *See Malone*, 965 F.3d at 505.

RHF's wage-interception argument also fails on a more fundamental level, even if we assume that Detroit Diesel was headquartered in Oregon and that it pays Ross from there.  In essence, Ross's complaint alleges that RHF interfered with property that is tethered to Michigan. Ross's wages are born out of his work in a Michigan factory.  R. 10-2 (Ross's Paystub) (Page ID

#202).  Michigan regulates the relationship between Ross, his employer, and his wages, setting a minimum hourly wage, Mich. Comp. Laws § 408.934, dictating when and how wages must be paid, *id.* §§ 408.472, 408.476, and taxing the wages of Michigan residents, and in some cases, nonresidents who earn their wages in the state, *id.* § 206.110.  And Michigan recognizes Ross's wages as a form of property.  *Bauserman v. Unemployment Ins. Agency*, 931 N.W.2d 539, 541 (Mich. 2019) ("In the instant case, plaintiffs were deprived of their property when . . . their wages [were] garnished.").  "A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors," *Burger King Corp.*, 471 U.S. at 473 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)), particularly when the injury stems from damage to property with significant connections to the forum and which forms the very essence of the plaintiff's "livelihood," *Johnson*, 85 F.4th at 431.

Next, RHF makes what amounts to a factual argument that it could not have intentionally targeted Ross in Michigan because it did not know that he lived or worked in the state when it sent the garnishment summons to Daimler Truck.  D. 20 (Appellee Br. at 20–22).  Ross, however, has adequately demonstrated that RHF knew he lived in Michigan, even if it did not know his exact address.  RHF admits that it learned from AAF that Ross had moved to Michigan.  R. 7-2 (Fudge Aff. ¶ 3(d)) (Page ID #86).  The exhibits Ross attaches to his complaint lead to the same conclusion.  Years before it mailed the garnishment summons that reached Detroit Diesel, RHF had attempted to mail notice of the default judgment to Ross in Michigan, R. 1-9 (12/22/2022 Certificate of Service) (Page ID #43), and before it mailed the garnishment summons, it again learned from Penske that Ross was still living in Michigan, R. 7-7 (2023 Penske Garnishment Answer at 1–2) (Page ID #122–23).  Even if RHF did not know exactly where in Michigan it was aiming, RHF certainly knew that it was targeting Ross and his wages in Michigan.

Yet RHF urges us to discount these facts.  D. 20 (Appellee Br. at 21).  In its experience, it asserts that the information that it receives about debtors' addresses tends to be inaccurate, so we should follow its lead and ignore the obvious inference that flows from the information it had in its possession—that Ross lived in Michigan.  *Id.* (citing R. 12-1 (Fudge Reply Aff. ¶¶ 6–8) (Page ID #216–17)).  But the information contained in the affidavit that RHF appended to its reply in

the district court squarely contradicts the facts that Ross included in his pleadings and opposition papers. RHF admits this, conceding that whether it "targeted Ross in Michigan prior to the garnishment was the central factual dispute in the District Court." D. 20 (Appellee Br. at 20). If RHF wished to resolve this dispute, it should have requested an evidentiary hearing. *See Malone*, 965 F.3d at 506. Because it did not do so, the controverting factual allegations in Fudge's affidavit are "irrelevant" to our analysis. *See id.* at 505. We hold, therefore, that RHF purposefully availed itself of conducting activities in Michigan by purposefully directing its alleged unlawful activity at a forum resident.

The remaining requirements of the due-process analysis require much less discussion. The second requires that the plaintiff's claims arise from or relate to the defendant's contacts with the forum state, a standard we have characterized as "lenient." *Schneider*, 669 F.3d at 703. Ross's FDCPA and MRCPA claims satisfy that standard, as they arise out of RHF's efforts to garnish Ross's Michigan wages.

The third requirement is satisfied if the forum state's exercise of jurisdiction over the defendant is reasonable. *Id.* If the first two requirements are satisfied, we infer that exercising personal jurisdiction over the defendant is reasonable. *Id.* When this inference comes into effect, in "only the unusual case" will we nevertheless determine that requiring a defendant to litigate in the forum is unreasonable under our criteria, which include: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Id.* at 703–04 (quoting *Air Prods. & Controls, Inc.*, 503 F.3d at 554–55). This is not an unusual case. Michigan "has an interest in ensuring that its residents have adequate recourse for harms inflicted by nonresidents," forcing Ross to litigate this case in Oklahoma "would impose a substantial burden on him," and RHF does not articulate any countervailing considerations that would render the exercise of jurisdiction unreasonable. *Id.* at 704.

Consequently, exercising personal jurisdiction over RHF in Michigan does not violate the Due Process Clause.

## 2. Michigan's Long-Arm Statute

We next evaluate whether Michigan law authorizes personal jurisdiction over RHF. "Michigan's interpretation of its long-arm statute requires a separate analysis from the Due Process Clause." *Sullivan*, 79 F.4th at 664. Although the district court discussed Michigan's long-arm statute, it declined to find whether the statute permitted it to enter a binding judgment against RHF. *See Ross*, 2025 WL 2265439, at *3 ("Ross's allegation that RHF violated Michigan's Uniform Enforcement of Foreign Judgment's [sic] Act and wrongfully garnished his wages without due process may be enough to find that specific jurisdiction is proper."). Yet whether the exercise of personal jurisdiction comports with Michigan's long-arm statute is a pure question of law, *see Sullivan*, 79 F.4th at 660, that was adequately briefed by the parties below, R. 7 (Def.'s Mot. to Dismiss at 12–14) (Page ID #74–76); R. 10 (Pl.'s Opp'n to Mot. to Dismiss at 11–14). As a result, we may "discuss this issue" and decide it. *Sigley v. City of Parma Heights*, 437 F.3d 527, 536 (6th Cir. 2006).

We have little trouble concluding that jurisdiction is proper under Michigan Compiled Laws § 600.715(2). Pursuant to this provision:

> The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
>
> . . .
>
> (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

Mich. Comp. Laws § 600.715(2). "A plain language reading of these words reveals that *either* the tortious conduct *or* the injury must occur in Michigan." *Sullivan*, 79 F.4th at 668 (quoting *Green v. Wilson*, 565 N.W.2d 813, 817 (Mich. 1997)). We have held that § 600.715(2) is satisfied where the plaintiff alleges that the defendant engaged in tortious conduct outside the state that "has caused an adverse economic effect upon [the plaintiff] in Michigan." *Neogen Corp.*, 282 F.3d at 888–89. That plainly happened here. Because of RHF's alleged FDCPA and MRCPA violations, Ross's Michigan employer withheld wages that he earned working in

Michigan.  RHF thus created the relationship with Michigan that § 600.715(2) envisions—taking actions that cause consequences in the state and give rise to claims that sound in tort.  *See Sullivan*, 79 F.4th at 668.  Accordingly, § 600.715(2) authorizes a Michigan forum to exercise personal jurisdiction over RHF.

## III.  CONCLUSION

RHF has seized the Michigan wages of Ross, a Michigan resident, allegedly violating the FDCPA and the MRCPA in the process.  In doing so, RHF has purposefully directed its allegedly unlawful actions at Ross in Michigan, fully aware that, in the end, Ross would be injured there.  For this reason, RHF has purposefully availed itself of the privileges of conducting activities in Michigan.  And because Ross's claims arise out of RHF's Michigan contacts, it is reasonable for Michigan to exercise personal jurisdiction over RHF, and Michigan's long-arm statute reaches RHF, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.